## APPEAL OF SIAN OIL AND GAS CO.

Docket No. 2549.    Submitted August 14, 1925.    Decided February 11, 1926.

The value of certain oil leases, for purposes of invested capital and depletion, determined.

*Edward Thompson, C. P. A.*, for the taxpayer.
*Benjamin H. Saunders, Esq.*, for the Commissioner.

### Before MARQUETTE and MORRIS.

This appeal is from the determination of a deficiency in income and profits taxes for the year 1918 in the amount of $45,465.38 and overassessments for 1917 and 1919 in the amount of $48,562.44. The questions presented are: (1) The value of certain oil leases, when paid in for the taxpayer's capital stock on November 14, 1912, for invested capital purposes; and (2) the March 1, 1913, value for purposes of depletion.

#### FINDINGS OF FACT.

The taxpayer is a Delaware corporation, with its principal offices in Pittsburgh, Pa.

Between May 12, 1912, and June 12, 1912, certain persons named Andrews and Smith acquired 14 leases of the oil rights in certain lands in Wabash County, Ill., with one-sixth royalty to the

lessors. The leases comprised a total area of 1,074 acres. The first oil well was drilled approximately at the geographical center of the leased property and at the southeast corner of the Adam Biehl land. When a depth of 1,489 feet was reached, oil was struck bringing in an initial daily production of 750 barrels. That discovery occurred on July 30, 1912, and constituted the first discovery of oil in Wabash County. In August, 1912, oil was brought in on the Caroline Smith property, owned by other persons and located about one mile to the south of the Biehl well, with an initial daily production of 750 barrels. On September 1, 1912, a second well sunk by Andrews and Smith on the C. E. Jordan property, lying a short distance southeast of the Adam Biehl well, brought in an initial production of 50 barrels. On September 7, 1912, a third well sunk by Andrews and Smith on the Edward Smith property, lying at the southerly part of the entire leased land, and as close to the Caroline Smith well as Andrews and Smith could drill an offsetting well, brought in an initial daily production of 500 barrels. In October, 1912, a well sunk by others than Andrews and Smith on the John Prout property, lying to the southwest of the Adam Biehl well and close to the Wolf property (leased to Andrews and Smith), brought in an initial daily production of 125 barrels. On November 11, 1912, a well sunk by Andrews and Smith on the Wolf property as an offset well to the one just referred to brought in an initial daily production of 225 barrels.

Andrews and Smith had drilled a well just to the south of the Adam Biehl tract, on the J. T. Smith land, and, on September 1, 1912, had reached a depth of 1,481 feet without striking oil. The operation was suspended solely by reason of litigation which had been started by other persons, who claimed a right in that land superior to that of Andrews and Smith. In the desire of settling the dispute before oil was disclosed as present in that land, Andrews and Smith, by the suspension of operations, gave the appearance that the drilling produced a dry well. After the dispute was settled another well was driven on that land, at the southerly border, and on November 24, 1912, brought in an initial production of 350 barrels.

At some date in 1912, prior to November 14, Andrews and Smith acquired a fifteenth lease of 58 acres, making the total area of their leased property 1,132 acres.

In September, 1912, steps had been taken to organize the taxpayer corporation and, with the organization duly effected, the 15 leases were transferred to the taxpayer on November 14, 1912. for its entire capital stock of $200,000 par value.

All of the leases were such as are customarily made in acquiring the oil rights in land. Each provided for royalties of one-sixth to the lessor, and was to continue in effect for stated periods or during the actual production of oil from the respective properties. None of the leases required the payment of either a bonus or rental in addition to the royalties.

The following leases were later abandoned or surrendered:

| Lease. | Acres. | Date acquired. | Date surrendered. |
| --- | --- | --- | --- |
| C. Litherland | 80 | June 12, 1912 | July 1, 1914 |
| Price | 83 | May 16, 1912 | July 1, 1914 |
| King | 25 | May 16, 1912 | June 22, 1914 |
| Courter | 99 | May 16, 1912 | July 1, 1914 |
| Ramsay | 96 | May 16, 1912 | Sept. 12, 1917 |
| Schafer | 58 | June 24, 1912 | July 1, 1917 |
| Total area | 441 | | |

All of the surrendered leases applied to property lying to the north of the Adam Biehl property. The Price lease was later reacquired by the taxpayer in 1915 for the cost of a well which had been sunk by the *ad interim* owner of the property. The production after 1915 was very small. The Courter lease was later sold in 1916 to others than the taxpayer for $700,000, but the sale included 135 acres of land in other leaseholds.

By March 1, 1913, the taxpayer had seven wells in operation on the leased property:

| Property. | Wells. | Property. | Wells. |
| --- | --- | --- | --- |
| Adam Biehl | 1 | Edward Smith | 2 |
| William Wolf | 1 | J. T. Smith | 1 |
| H. Mullimax | 1 | C. E. Jordan | 1 |

Prior to March 1, 1913, dry wells were driven by the taxpayer on:

> William D. Ramsay property.
> John Beasley property.
> H. Mullimax property.
> Edward Smith property (two dry holes).

Dry holes were drilled on adjoining land of other parties than the taxpayer prior to March 1, 1913:

> Payne property.
> Margaret Price property.

The following wells were sunk on the various properties of the taxpayer:

*Adam Bichl (109 acres).*

| Well No. | Date completed. | Initial production. | Well No. | Date completed. | Initial production. |
|---|---|---|---|---|---|
|  |  | *Barrels.* |  |  | *Barrels.* |
| 1 | July 30, 1912 | 750 | 4 | Oct. 5, 1916 | 150 |
| 2 | Aug. 13, 1916 | 375 | 5 | Nov. 20, 1916 | 175 |
| 3 | Sept. 15, 1916 | 50 | 6 | Dec. 23, 1916 | 45 |

## Total gross production according to pipe line run, in barrels:

| | | | |
|---|---|---|---|
| 1912 | 24, 661. 36 | 1916 | 32, 992. 98 |
| 1913 | 13, 769. 09 | 1917 | 54, 113. 82 |
| 1914 | 7, 506. 00 | 1918 | 27, 228. 29 |
| 1915 | 6, 792. 54 | 1919 | 16, 519. 51 |

*H. E. Jones (15 acres).*

| Well No. | Date completed. | Initial production. |
|---|---|---|
|  |  | *Barrels.* |
| 1 | May 30, 1913 | 250 |
| 2 | June 26, 1914 | 100 |

## Total gross production:

| | Barrels. | | Barrels. |
|---|---|---|---|
| 1913 | 13, 674. 94 | 1917 | 5, 285. 39 |
| 1914 | 12, 551. 56 | 1918 | 4, 132. 57 |
| 1915 | 10, 458. 12 | 1919 | 2, 471. 43 |
| 1916 | 6, 467. 23 | | |

*C. E. Jordan (80 acres).*

| Well No. | Date completed. | Initial production. | Well No. | Date completed. | Initial production. |
|---|---|---|---|---|---|
|  |  | *Barrels.* |  |  | *Barrels.* |
| 1 | Sept. 1, 1912 | 50 | 5 | June 15, 1916 | 125 |
| 2 | Jan. 20, 1916 | 100 | 6 | July 9, 1916 | 125 |
| 3 | Apr. 28, 1916 | 200 | 7 | June 15, 1916 | 60 |
| 4 | May 9, 1916 | 70 |  |  |  |

## Total gross production:

| | Barrels. | | Barrels. |
|---|---|---|---|
| 1912 | 873. 52 | 1916 | 60, 411. 64 |
| 1913 | 2, 515. 01 | 1917 | 33, 603. 69 |
| 1914 | 959. 82 | 1918 | 24, 681. 64 |
| 1915 | 3, 879. 87 | 1919 | 17, 745. 39 |

*J. H. Jordan (80 acres).*

| Well No. | Date completed. | Initial production. | Well No. | Date completed. | Initial production. |
|---|---|---|---|---|---|
| | | *Barrels.* | | | *Barrels.* |
| 1 | Oct. 4, 1914 | 80 | 3 | May 31, 1917 | 75 |
| 2 | Nov. 8, 1915 | 120 | 4 [1] | Nov. 4, 1918 | 2 |

[1] No. 4 was abandoned Nov. 4, 1918.

## Total gross production:

| | Barrels. | | | Barrels. |
|---|---|---|---|---|
| 1914 | 9, 172. 86 | | 1917 | 23, 334. 44 |
| 1915 | 11, 423. 15 | | 1918 | 12, 699. 29 |
| 1916 | 29, 191. 03 | | 1919 | 5, 883. 12 |

*R. Litherland (97 acres).*

| Well No | Date completed. | Initial production. |
|---|---|---|
| | | *Barrels.* |
| 1 | Mar. 6, 1913 | 200 |
| 2 | June, 1913 | 200 |
| 3 [1] | May, 1914 | 1 |

[1] No. 3 was abandoned in May, 1914.

## Total gross production:

| | Barrels. | | | Barrels. |
|---|---|---|---|---|
| 1913 | 27, 971. 00 | | 1917 | 2, 356. 40 |
| 1914 | 24, 202. 56 | | 1918 | 1, 783. 60 |
| 1915 | 6, 846. 48 | | 1919 | 1, 532. 15 |
| 1916 | 3, 170. 52 | | | |

*R. Mullimax (40 acres).*

| Well No. | Date completed. | Initial production. |
|---|---|---|
| 1 | January, 1913 | 275 barrels. |
| 2 | February, 1913 | Drilling suspended because of offset well being dry. |

## Total gross production:

| | Barrels. | | | Barrels. |
|---|---|---|---|---|
| 1913 | 6, 203. 34 | | 1917 | 635. 29 |
| 1914 | 1, 905. 54 | | 1918 | 284. 20 |
| 1915 | 1, 968. 90 | | 1919 | None. |
| 1916 | 744. 84 | | Production ceased entirely in 1921. | |

*Edward Smith (120 acres).*

| Well No. | Date com-pleted. | Initial produc-tion. | Well No. | Date com-pleted. | Initial produc-tion. |
|---|---|---|---|---|---|
|  |  | *Barrels.* |  |  | *Barrels.* |
| 1 | Sept.   7, 1912 | 500 | 5 | June 27, 1913 | 100 |
| 2 | Dec.,      1912 | [1] 1 | 6 | Aug.   1, 1913 | 200 |
| 3 | Dec.,      1912 | [1] 1 | 7 | Sept.,   1914 | [1] 1 |
| 4 | Feb.,      1913 | 175 | 8 | Dec. 12, 1915 | 75 |

[1] Abandoned.

## Total gross production:

|  | Barrels. |  | Barrels. |
|---|---|---|---|
| 1912 | 14, 925. 54 | 1916 | 34, 203. 60 |
| 1913 | 30, 183. 61 | 1917 | 14, 766. 07 |
| 1914 | 37, 038. 90 | 1918 | 5, 555. 40 |
| 1915 | 34, 727. 46 | 1919 | 3, 486. 19 |

*Jacob Smith (140 acres).*

| Well No. | Date com-pleted. | Initial produc-tion. | Well No. | Date com-pleted. | Initial produc-tion. |
|---|---|---|---|---|---|
|  |  | *Barrels.* |  |  | *Barrels.* |
| 1 | Sept.   1, 1912 | [1] 1 | 8 | Aug.,      1915 | 120 |
| 2 | Nov. 24, 1912 | 350 | 9 | Mar.   3, 1917 | 100 |
| 3 | Nov. 11, 1913 | 100 | 10 | May 31, 1917 | 100 |
| 4 | Nov. 17, 1913 | 75 | 11 | July 12, 1917 | 105 |
| 5 | Jan.   13, 1914 | 125 | 12 | Oct.,      1917 | 75 |
| 6 | Feb.   2, 1914 | 125 | 13 | Mar.,     1918 | [1]Showing. |
| 7 | Aug.   3, 1914 | 125 | 14 | June   2, 1918 | 75 |

[1] Abandoned.

## Total gross production:

|  | Barrels. |  | Barrels. |
|---|---|---|---|
| 1912 | 1, 866. 67 | 1916 | 28, 561. 92 |
| 1913 | 26, 710. 87 | 1917 | 53, 303. 20 |
| 1914 | 56, 450. 52 | 1918 | 54, 996. 22 |
| 1915 | 44, 500. 36 | 1919 | 30, 485. 28 |

*Wm. Wolfe (10 acres).*

| Well No. | Date completed. | Initial production. |
|---|---|---|
| 1 | Nov. 9, 1912 | 225 barrels. |

## Total gross production:

|  | Barrels. |  | Barrels. |
|---|---|---|---|
| 1912 | 2,517.91 | 1916 | 1,967.46 |
| 1913 | 5,813.14 | 1917 | 1,643.76 |
| 1914 | 4,975.56 | 1918 | 1,415.45 |
| 1915 | 2,911.28 | 1919 | 1,326.19 |

*V. H. Price (83 acres).*

| Well No. | Date completed. | Initial production. |
|---|---|---|
| 1 | Nov. 26, 1915 | 15 barrels. |
| 2 | April, 1917 | Showing    (abandoned). |

Total gross production:

1918 _____ 120. 62  barrels.
1919 _____ 57. 87  barrels.

The fair market value of the leaseholds on November 14, 1912, was $600,000 and the fair market value on March 1, 1913, was $616,404.83.

### DECISION.

The determination of the Commissioner is approved.

### OPINION.

MARQUETTE: The difficulty in valuing oil leases is well illustrated by the facts in this appeal. On the Courter lease of 99 acres, the taxpayer drove a well in November, 1913, to a depth of almost 1,600 feet and, finding practically no oil, immediately abandoned the well. The lease was surrendered on July 1, 1914. Wells were later drilled on this land by others, and the land proved to be very productive— so much so that the lease was sold in 1916 for $700,000, and one month later for $1,000,000. That property lay to the northeast of the Adam Biehl discovery well.

On the other hand, leases for property surrounding that held by Andrews and Smith were sold after the original discovery of July 30, 1912, and prior to the transfer to the taxpayer, at prices ranging from $57.14 an acre to $300 an acre. Of 10 or more such transactions, oil was brought in on only one of the properties, that one being directly to the south of the taxpayer's land, and, although the 1912 sales price was $100 an acre, the land later proved to be very productive.

Subsequent events demonstrated that about half of the original acreage acquired by Andrews and Smith was productive, and even the Adam Biehl land, where the oil was first discovered, proved to be only on the border of the subterranean oil pool. Even to the south the land was not entirely productive. A dry area, constituting about two-thirds of the acreage within the Edward Smith lease, became apparent after several successive wells had been driven.

A situation of wide variation in the evidence has been presented for our consideration. Even as recently as September, 1918, the tax-

payér, in a letter to the Commissioner, stated, "We estimate the fair market value of this property on March 1, 1913, to be $200,000." In 1912, after the original discovery, Andrews and Smith declined an offer of $600,000 for the property. Under date of February 5, 1923, petroleum engineers employed by the taxpayer, in rendering a most exhaustive report on all of the taxpayer's properties, gave a total value at acquisition on November 14, 1912, of $721,271.15, and a March 1, 1913, value for the oil reserves of $797,115.31, and claimed a paid-in surplus on November 14, 1912, of $291,838.22. The divergence of opinion by expert witnesses is shown in the following table:

| | Nov. 14, 1912. | Mar. 1, 1913. |
|---|---|---|
| Riddle | "About $1,000,000" | About the same. |
| Bell | $1,500 an acre | Increased. |
| Price | $1,000,000 | In excess of $1,500,000. |
| | $1,200 to $1,500 an acre | $1,500 an acre. |
| | $1,250,000. Affidavit Oct. 23, 1912, "not less than $1,500,000." | |
| Young | $1,000,000 to $1,250,000. Affidavit Oct. 24, 1922, "in excess of $1,500,000." | "$1,000,000 at least." |
| Loftive | $1,600 to $2,000 an acre | Same as Nov. 14, 1912. |
| Cochran | $1,700,000 | Same as Nov. 14, 1912. |
| | $1,500 an acre | |
| Morrissey | $1,500 an acre | |
| Andrews | $1,500 to $2,000 an acre | |

It will be observed that the opinions of the taxpayer's witnesses show a margin of value between $1,000,000 and $2,268,000, and the full divergence of value runs between $2,268,000 and the $200,000 claimed by the taxpayer itself in 1918. Between these two extremes lies the Commissioner's determination of $600,000.

All of the witnesses seemed to have sufficient qualifications, from their long experience in the oil business and their knowledge of the particular locality, to express opinions as to value, but it is perfectly apparent that their opinions were based primarily upon the record of production of oil in the immediate vicinity over the series of years subsequent to 1912. At the time of the discovery of oil in 1912, it is obvious that any value of a leasehold was purely speculative and incapable of a reduction to any assured amount. That is sufficiently clear from our reference to the Courter lease, and to the many adjoining properties where leaseholds sold, *after* the discovery, at prices ranging from $300 an acre to less than $60 an acre, and the fact that none of those leases proved productive of oil except the single one which sold on a basis of $100 an acre. The abandonment by the taxpayer of over 400 acres, within two years after discovery, shows conclusively that a value of $1,500 an acre could not be credited to every acre of land included within the fifteen leases. Yet, the value admitted by the Commissioner of $600,000 means an average value per acre of about $530 for all of the 1,134 acres. In view of the sales, which in no instance exceeded $300 an acre, and the abandonment

by the taxpayer of over one-third of its leaseholds, and the fact that much of the retained acreage showed no oil production, we are not convinced that the fair market value of the property exceeded the value determined by the Commissioner.

It should be observed further that the opinions of the several witnesses, and the engineer's report as well, had in view the value of the oil within the property, or the value of the land by reason of its natural resources, and did not contemplate a valuation for the leasehold interests, with proper apportionment between the lessors and the taxpayer-lessee. Discounting some degree of exaggeration in a retrospective opinion of value, influenced as the same appears to be by the record of production from the entire oil pool, and crediting the value partially to both lessors and lessees, we find considerable corroboration for the Commissioner's determination of value in the opinions of the taxpayer's own witnesses.

We were not advised of the method used by the Commissioner in his determination of value. The taxpayer relied entirely upon opinion evidence, and the report by the engineer to the taxpayer was submitted by the Commissioner in contradiction of the taxpayer's contention as to value. Except for the facts set forth in that report, we have had no opportunity for making a careful appraisal of the leaseholds in question. This must have been done by the Commissioner in reaching his conclusion, and the data in the report of the taxpayer's engineer confirms that decision. For example, the engineer arrived at a total value for the property on November 14, 1912, with the following apportionment:

|  | Acres. | Value per acre. | Value, Nov. 14, 1912. |
|---|---|---|---|
| Undeveloped acreage: |  |  |  |
| A. Biehl | 55 | $300.00 | $16,500.00 |
| C. E. Jordan | 35 | 400.00 | 14,000.00 |
| T. H. Jordan | 80 | 500.00 | 40,000.00 |
| Robt. Litherland | 97 | 600.00 | 58,200.00 |
| H. Mullimax | 40 | 750.00 | 30,000.00 |
| L. Courter (later abandoned) | 99 | 750.00 | 74,250.00 |
| C. A. Ramsay (later abandoned) | 96 | 300.00 | 28,800.02 |
| W. B. King (later abandoned) | 25 | 300.00 | 7,500.00 |
| U. H. Price (later abandoned) | 83 | 275.00 | 22,825.00 |
| L. F. Litherland (later abandoned) | 80 | 250.00 | 20,000.00 |
| P. Schafer (later abandoned) | 58 | 250.00 | 14,500.00 |
|  | 748 | ---------- | 326,575.00 |
| Developed acreage: |  |  |  |
| H. E. Jones | 15 | 994.38 | 14,915.75 |
| C. E. Jordan | 45 | 1,202.52 | 54,113.47 |
| Edw. Smith | 120 | 941.99 | 113,038.85 |
| J. Smith | 140 | 1,066.74 | 149,344.59 |
| W. Wolfe | 10 | 1,109.54 | 11,095.40 |
| A. Biehl | 54 | 755.22 | 40,782.13 |
| Developed area | 384 | ---------- | 383,290.19 |
| Undeveloped area | ---------- | ---------- | 326,575.00 |
| Total value | ---------- | ---------- | 709,865.19 |

Apportioning five-sixths of that amount to the lessee, would give a value of $591,554.30, or approximately the total value allowed by the Commissioner, and we believe a value of $600,000 represents the fair market value of the properties at November 14, 1912, when they were acquired by the taxpayer, and that this amount should be used in computing invested capital.

The Commissioner determined the value as of March 1, 1913, to be $616,404.93, or an increase of $16,404.83 over the values of November 14, 1912. The evidence does not show to what this increase in value was attributed, nor has the taxpayer shown any error therein. In the circumstances, the Commissioner's determination of March 1, 1913, value must be approved.